
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 11, 2017

**STATE OF TENNESSEE v. SHANE H. BISHOP**

**Appeal from the Circuit Court for Chester County**
No. 15-CR-73        Kyle Atkins, Judge
_____

**No. W2016-01688-CCA-R3-CD**
_____

Defendant, Shane H. Bishop, pled guilty to vehicular homicide by intoxication. He appeals from his sentence of eleven years, arguing that the trial court abused its discretion by denying an alternative sentence. Because Defendant was ineligible for an alternative sentence, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

George Morton Googe, District Public Defender, and Kandi Kelley Collins, Assistant Public Defender, for the appellant, Shane H. Bishop.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Jerry Woodall, District Attorney General; and Christopher Post, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Procedural History and Factual Summary*

On October 27, 2015, Defendant was indicted for vehicular homicide resulting from the driver's intoxication, driving under the influence of an intoxicant ("DUI"), driving under the influence of an intoxicant with a blood alcohol concentration of .08 or more ("DUI per se"), and failure to exercise due care. The charges resulted from a single-vehicle accident in which Defendant's passenger, Wyndy Hubbard, died. On April

22, 2016, Defendant pled guilty as charged. The trial court merged both DUI convictions into the vehicular homicide conviction and held a sentencing hearing.

At the sentencing hearing, the State introduced the pre-sentencing report. Waylon Mahler testified that the victim was his sister and that she had previously been in a relationship with Defendant. Mr. Mahler acknowledged that the victim's relationship with Defendant was "not good" and indicated that Defendant was a negative influence on the victim. Mr. Mahler described Defendant as a person who took advantage of anyone who tried to help him.

Jennifer Mahler testified that the victim was her stepdaughter. The victim's death was "devastating" to Ms. Mahler because her relationship with the victim was more like that of "close friends" than that of a parent and child. They were "very close" and "always did family functions together." Ms. Mahler described the victim as "a really wonderful person. She lit up the room every time she walked in."

Ms. Mahler described Defendant's relationship with the victim as "on and off" and "up and down." On one occasion, Defendant and the victim had an argument, during which Defendant "proceeded to smoke crack in front of her and blow it in her face while she was pregnant. And, she was very, very devastated by that." A few months later, the victim walked in on Defendant "having sex with another woman." Ms. Mahler suspected that Defendant may have physically abused the victim because "she had several black eyes when they were together."

The victim told Ms. Mahler that Defendant was bipolar and that she wanted him to take medication. The victim also told Ms. Mahler that she was "worried" because Defendant's "behavior would become erratic." Despite having a young child in the house, "[i]n the middle of the night, [Defendant] would wake up and be walking around the house and put his old uniform on and turn on the karaoke machine and be singing at the top of his lungs."

The victim and Defendant had a seven-month-old daughter at the time of the crash. Afterward, Ms. Mahler and her husband obtained emergency custody of the infant. Ms. Mahler "stopped going to college" so that she could provide for the victim's daughter. Ms. Mahler said that the victim did not think Defendant was capable of taking care of their daughter by himself.

Keith Mahler testified that the victim was his daughter. He explained, "She was a lot of fun to be around. Happy, lit up the room. Everybody who worked with her just loved her dearly. . . . [S]he was a good person, had a kind heart." Mr. Mahler testified

that the victim's death "hurt [him] inside" and "changed" him. Mr. Mahler confirmed that after the crash he and his wife took care of the victim's infant daughter.

Mr. Mahler described the victim's relationship with Defendant as "up and down." Regarding Defendant, Mr. Mahler stated:

Life's about a bunch of choices. We've got choices every day. [Defendant] makes all the wrong ones, very few right ones. And we've talked about that. He lives in the now, and he's very selfish. He's not a giving person; he likes to take. [The victim] thought she could change him. She wanted [their daughter] to have a daddy.

. . . .

He made bad choices all the time. Up and down. Oh, he had an angry streak in him, and when he wasn't on his bipolar medicine, boy, he could snap at any time. And she would tell me that. She'd have to walk on rice paper around the house because one little thing would send h[im] off.

Mr. Mahler expressed his belief that Defendant was physically abusive to the victim. Mr. Mahler also alleged that Defendant "took two thousand dollars of [the victim's] money she was saving up for a car and smoked it up in crack."

Colton Hubbard testified that he was the victim's fourteen-year-old son. He described the victim as "a great mother," whom he missed and "loved very much." Mr. Hubbard said that he had "dreams about her all the time."

Defendant testified that he met the victim in 2012, and they were in a romantic relationship for three years. However, Defendant was still married to a different woman from whom he had been separated for approximately eight years. He described the victim as "the love of [his] life."

On the night of the accident, Defendant and the victim had a "date night." Defendant received permission to leave work, and he and the victim went to dinner around 9:30 p.m. They each drank two beers with dinner. Then, they went to a karaoke bar, and each consumed three more beers. They left the karaoke bar around 2:30 a.m. Defendant did not think that he was impaired when they left. Their vehicle crashed into a tree on the way home. Defendant admitted that he was driving on a revoked license.

After the accident, Defendant was in the hospital for four days. Defendant listed his injuries as a broken right femur, a broken left humerus, several broken ribs, a

fractured sternum, a fractured right clavicle, a fractured right hip socket, a fractured pelvis, a crushed right ankle, and a punctured lung. He was in a wheelchair for about three months and was unable to work during that period.

Defendant admitted that he would get drunk "two or three nights a week," and he acknowledged that he "probably was developing a problem." Defendant also admitted that he "had drug problems in the past," but he insisted that he "got clean before [their daughter] was born and . . . stayed clean as far as drugs." Defendant began using cocaine when he was twenty-three years old. He joined the National Guard when he was twenty-five years old and "stayed clean for a long time." He left the military after two years and started using drugs again with a woman he was dating. Around 2008 or 2009, Defendant was diagnosed with bipolar disorder. While incarcerated in 2011 or 2012, Defendant was dismissed from a rehabilitation program after two and a half weeks. He went to voluntary rehabilitation in April 2014. His program was supposed to last for almost a month, but he left after seven days because he was manic. Defendant obtained medication for his bipolar disorder, but he eventually quit taking the medication because he was unemployed and could not afford it.

Defendant testified that he was ready to receive long-term drug and alcohol treatment. He said that he aspired to become a drug and alcohol counselor and to help other people. Defendant testified, "[W]ords can't express how sorry I am. . . . If there was anything I could do to bring [the victim] back, if it meant taking her place, I would in a heartbeat." Defendant apologized to the victim's family and asked for forgiveness.

Defendant acknowledged that he had previously received several tickets for seatbelt violations. He also admitted that his criminal history included convictions for evading arrest, harassment, stalking, aggravated criminal trespass, assault, domestic assault, and simple possession. Defendant admitted that he previously violated probation on three different occasions.

Lisa Hulley testified that her husband, Luke Hulley, was the pastor of Faith, Hope, and Love Church in Lexington. The Hulleys met Defendant in August 2015, about three months after the crash, when he visited their congregation. They were familiar with Defendant's brother-in-law. Pastor Hulley wanted to help Defendant because, as Ms. Hulley explained, "Our passion is for people that have drug abuse and alcohol abuse." Defendant lived with the Hulleys for several months. During that time, he helped with the housework and yardwork. Defendant did not consume alcohol while living with them. Defendant returned to his job after getting permission from his doctor. The Hulleys drove Defendant to work and took Defendant to visitation with his daughter. Ms. Hulley testified that Defendant could stay with them again if he was given an alternative

sentence. However, she acknowledged that Defendant would be expected to abide by the terms of his release and would not be permitted to use drugs or alcohol.

Ms. Mahler testified in rebuttal for the State. She denied that the Hulleys constantly supervised Defendant because, during "the last couple visitations," Defendant told Ms. Mahler that he had been staying with his girlfriend "for a couple weeks." Ms. Mahler also testified that, after the accident, Defendant posted several videos on Facebook in which he made threats to Ms. Mahler and her husband and to the victim's mother. The trial court initially sustained an objection to playing the videos but later asked the witness to play one of the videos on her phone. The video is not in the record.

The trial court found Defendant to be a standard offender. It applied the enhancement factors for previous history of criminal behavior, particularly great injuries to the victim, and previously failing to comply with the conditions of release. It did not apply any mitigating factors. The trial court imposed a sentence of eleven years. The trial court denied alternative sentencing based on Defendant's previous criminal history and previous failures to comply with conditions of release. The trial court also found that an alternative sentence would unduly depreciate the seriousness of the offense. The trial court authorized Defendant to receive special needs treatment while in prison.

*Analysis*

On appeal, Defendant argues that the trial court abused its discretion by denying an alternative sentence and that the trial court improperly considered the Facebook video while making its decision. The State disagrees.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The same standard of review applies to a trial court's decision regarding "probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court considers the following factors when determining the sentence for a criminal conviction: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102,-103,-210; *see also Bise*, 380 S.W.3d at 697-98.

Vehicular homicide resulting from a driver's intoxication is a Class B felony. T.C.A. § 39-13-213(b)(2)(A). As such, the sentencing range for a standard offender is eight to twelve years. T.C.A. § 40-35-112. Defendant does not challenge the length of his sentence. Nonetheless, we note that the record demonstrates that the trial court carefully considered the purposes and principles of the Sentencing Act as well as the sentencing factors listed above. The trial court also considered applicable enhancing and mitigating factors. Because the trial court imposed a sentence within the applicable range and the sentence was consistent with the purposes and principles of the Sentencing Act, the sentence is presumed reasonable, and we cannot say that the trial court abused its discretion in ordering a sentence of eleven years.

Having determined that the trial court imposed a proper sentence, we turn to Defendant's assertion that the trial court should have ordered a sentence of split confinement. Tennessee Code Annotated section 40-35-102(3)(C) provides that "[p]unishment shall be imposed to prevent crime and promote respect for the law by . . . [e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants[.]" Tennessee Code Annotated section 40-35-104(c)(5) authorizes an alternative "sentence of continuous confinement to be served in a local jail or workhouse in conjunction with a term of probation." However, a defendant is eligible for probation only if the sentence imposed is ten years or less. T.C.A. § 40-35-303(a). In this case, Defendant was convicted of a Class B felony and received an eleven-year sentence. Therefore, Defendant was not eligible for an alternative sentence and could not have received a sentence of split confinement. *See State v. Timothy Clark Naifeh*, No. W2015-1204-CCA-R3-CD, 2016 WL 3345270, at *16 (Tenn. Crim. App. May 27, 2016) (noting that "a sentence greater than ten years would render the [d]efendant ineligible for an alternative sentence"), *perm. app. denied* (Tenn. Sept. 30, 2016). Accordingly, Defendant is not entitled to relief on this issue.

Defendant also argues that the trial court improperly considered the Facebook video shown by Ms. Mahler. However, Defendant fails to support this claim with an

argument or citation to authority. Thus, it is waived. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE